RTP:VTN
F. #2017R01180

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

AGNETA WELBER,
   also known as "Agneta Aizikovitch,"

         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

**COMPLAINT AND AFFIDAVIT IN SUPPORT OF ARREST WARRANT**

(18 U.S.C. §§ 1347, 1542; 42 U.S.C. § 408(a)(4))

Case No. 21-MJ-866

EASTERN DISTRICT OF NEW YORK, SS:

    Janell Borrison, being duly sworn, deposes and states that she is a Special Agent with the Social Security Administration ("SSA"), Office of the Inspector General ("OIG"), duly appointed according to law and acting as such.

    On or about August 24, 2016, within the Eastern District of New York and elsewhere, the defendant AGNETA WELBER, also known as "Agneta Aizikovitch," did willfully and knowingly make one or more false statements in an application for a passport with intent to induce and secure the issuance of a passport under the authority of the United States, for her own use, contrary to the law regulating the issuance of passports and the rules prescribed pursuant to such laws, to wit: Title 22, United States Code, Section 213 and Title 22, Code of Federal Regulations, Section 51.20(b).

    (Title 18, United States Code, Section 1542)

    In or about and between October 2007 and May 2021, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant

Case 1:21-mj-00866-SJB   Document 1   Filed 07/28/21   Page 2 of 18 PageID #: 2

2

AGNETA WELBER, also known as "Agneta Aizikovitch," having knowledge of the occurrence of any event affecting the initial and continued right of payment under Subchapter II of Title 42, United States Code, Chapter 7, did conceal and fail to disclose said event with intent to fraudulently secure payment in a greater amount than is due and when no payment is authorized.

(Title 42, United States Code, Section 408(a)(4))

In or about and between October 2008 and May 2021, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant AGNETA WELBER, also known as "Agneta Aizikovitch," did knowingly and willfully execute a scheme to defraud Medicare, a health care benefit program, and to obtain, by means of materially false and fraudulent pretenses, representations and promises and money owned by, and under the custody and control of, Medicare and Medicaid, in connection with the delivery of and payment for health care benefits, items, and services.

(Title 18, United States Code, Section 1347)

In or about and between February 2010 and May 2021, both dates being approximate and inclusive, within the Eastern District of New York, the defendant AGNETA WELBER, also known as "Agneta Aizikovitch," did knowingly and willfully use, acquire and possess benefits of the Supplemental Nutrition Assistance Program of a value of more than $5,000, in a manner contrary to Title 7, United States Code, Chapter 51 and the regulations issued pursuant thereto.

(Title 7, United States Code, Section 2024(b))

The source of your deponent's information and the grounds for her belief are as follows:[1]

1. I am a Special Agent with the SSA OIG and have been involved in the investigation of numerous cases involving theft of government property, bank fraud, wire fraud and passport fraud. I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file, including the defendant's criminal history record; and from reports of other law enforcement officers involved in the investigation.

2. I have been assigned to a joint investigation with special agents of the United States Department of State, Diplomatic Security Service ("DSS") and the United States Department of Health and Human Service, Office of the Inspector General ("HHS OIG"). We are investigating the defendant AGNETA WELBER, also known as "Agneta Aizikovitch," and her use of two different identities to fraudulently obtain a United States passport, benefit payments from the SSA, health care benefits from federal health care benefits programs (Medicare and Medicaid), and food-purchasing assistance from the federally funded Supplemental Nutrition Assistance Program.

THE DEFENDANT'S PASSPORT APPLICATIONS

3. A search of the records of the United States Department of State revealed the defendant has submitted at least four passport applications in the name of Agneta Welber using a social security number ("SSN") ending in 6839 (the "Welber SSN"). Each of those four passport applications was approved, and passports were issued in the name of Agneta Welber on

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

July 2, 1981, February 10, 1984, October 31, 2001, and October 9, 2013. As part of the passport application submitted in 1984, the defendant provided a copy of the naturalization certificate of Agneta Welber, issued in the Eastern District of New York, on July 22, 1975 (the "Welber Certificate of Naturalization"), as proof of her citizenship. The passport issued in the name of Agenta Welber on October 9, 2013 (the "2013 Welber Passport") was mailed to the defendant's residence in Brooklyn, New York (the "Brooklyn Residence").

4. A search of the records of the United States Department of State revealed that prior to 2016, the defendant submitted at least two passport applications in the name of Agneta Aizikovitch. Each of those two passport applications was approved and passports were issued in the name of Agneta Aizikovitch on October 19, 1990 and February 3, 2006. A review of those two prior passports revealed the following details.

   a. In the passport application submitted in 1990 (the "1990 Aizikovitch Application"), the defendant stated that her social security number was the Welber SSN, that she was married to Michael Aizikovitch and had never previously been issued a passport. As part of the 1990 Aizikovitch Application, the defendant provided a copy of the Welber Certificate of Naturalization, as proof of her citizenship.

   b. In the passport application submitted in 2006, (the "2006 Aizikovitch Application"), the defendant stated that her social security number was a number ending in 3959 (the "Aizikovitch SSN"). As part of the 2006 Aizikovitch Application, the defendant provided the passport issued on October 19, 1990 in the name of Agneta Aizikovitch as proof of identification.

5. On or about August 24, 2016, the defendant signed an application for renewal of her United States passport in the name of Agneta Aizikovitch (the "2016 Aizikovitch Application") and included a photograph of herself as part of the 2016 Aizikovitch Application. In the 2016 Aizikovitch Application, the defendant stated that her SSN was the Aizikovitch SSN. The 2016 Aizikovitch Application included the following instruction, followed by an area to provide a response:

> 9. List all other names you have used. (*Examples: Birth Name, Maiden, Previous Marriage, Legal Name Change. Attach additional pages if needed.*)

The defendant left the response to that instruction blank.

6. The 2016 Aizikovitch Application also asked the applicant to provide information about the applicant's "most recent U.S. passport book and/or passport card," including the name printed on the passport book or passport card and the issue date. The defendant answered that her most recent U.S. passport book and/or passport card was issued in the name of Agneta Aizikovitch on February 3, 2006.

7. On or about August 24, 2016, the defendant authorized Deluxe Passport Express ("Deluxe") of Brooklyn, New York, to submit the 2016 Aizikovitch Application on her behalf to a United States passport agency. The New York Passport Agency (the "Agency") located in New York, New York, received the 2016 Aizikovitch Application sent by Deluxe on or about August 26, 2016.

8. The 2016 Aizikovitch Application was reviewed by the Agency. A facial recognition software used by the Agency determined that the person depicted in the photograph submitted as part of the 2016 Aizikovitch Application was the same person depicted in the 2013 Welber Passport. I have compared the photograph submitted with the 2016 Aizikovitch

Application and the photograph depicted in the 2013 Welber Passport and believe that they are both photographs of the defendant, who I met at the Brooklyn Residence on or about May 22, 2017.  I have further reviewed the photographs associated with each of the other passports referenced above and issued in the names of Agneta Welber or Agneta Aizikovitch in 1981, 1984, 1990, 2001, and 2006, and they each appear to be photographs of the defendant.

9. For the reasons described herein, I believe that the defendant intentionally failed to disclose in the 2016 Aizikovitch Application that she has previously used a second identity in the name of Agneta Welber and that she had most recently obtained a passport book in the name of Agneta Welber in 2013.

SOCIAL SECURITY BENEFITS RECEIVED BY THE DEFENDANT

10. As described further below, the defendant used both the Welber SSN and the Aizikovitch SSN and defrauded the SSA by making false statements and concealing material facts to collect SSA benefits under the Welber SSN.

11. Social Security Disability Insurance ("SSDI") was a benefit program administered by the SSA.  In order to be awarded SSDI, an individual was required to work for a sufficient period of time and have paid taxes to Social Security, but he or she also must have had a medical condition that met the SSA's definition of a "disability."  There was no age requirement to collect SSDI benefits.

12. SSDI beneficiaries were notified at the time of application, and periodically while they received benefits, of their responsibility to inform SSA if they return to work or their disabling condition improves.  Once approved for SSDI payments, an SSDI recipient's eligibility could be terminated if he or she became able to work and earn more than a certain monthly amount, known as "Substantial Gainful Activity."

13. SSA benefits payments were made monthly by the United States Department of the Treasury ("Treasury") on behalf of the SSA, either by a physical check or direct deposit into a bank account designated by the beneficiary.

14. In or about 1974, the defendant applied for and was issued the Welber SSN under the name Agneta Welber (the "Welber Identity"). On or about October 3, 2007, the defendant applied for SSDI under the Welber Identity and claimed that she was unable to work due to a disabling condition. In her application, she provided the following information, in relevant part: (1) she had become unable to work because of her disabling condition in 2002; (2) she had not worked at any time since her disabling condition interfered with her ability to work; and (3) she was not working when she submitted her application. Based on the information provided in her application, the SSA approved the defendant's application, determined that the defendant was eligible for SSDI benefits as of October 2006, and began making monthly payments to the defendant starting January 2008.[2] In or about and between January 2008 and May 2021, the defendant received a total of approximately $206,368.50 in SSDI payments under the Welber Identity, via direct deposit into a Santander Bank account and a Dime Community Bank account, both of which were opened under the Welber Identity.

15. In or about 1994, the defendant applied for and was issued the Aizikovitch SSN under the name Agneta Aizikovitch (the "Aizikovitch Identity"). As proof of identification, she presented the passport in the name of Agneta Aizikovitch issued on October 19, 1990, and referenced above in paragraph 4. The records of the SSA reveal that in or about

---

[2] Based on the information provided by the defendant, the SSA determined that the defendant was disabled as of April 1, 2003. The SSA could not provide retroactive benefit payments of more than 12 months from the date of the filing of the application for benefits. Since the defendant filed her application in October 2007, the defendant's first monthly SSDI payment was for October 2006.

and between 2006 and 2015, the defendant earned a total income of approximately $325,753.90, which was also reported to the Internal Revenue Service ("IRS"), under the Aizikovitch Identity from various in-home health care service providers. There was no income reported to the IRS or to the SSA after 2015 under the Aizikovitch Identity; however, as described below, the defendant continued to work and earn unreported income after 2015.

16. On or about March 11, 2019, I interviewed a woman ("Jane Doe") who stated that she had employed the defendant, whom she knows by the name Agneta Welber, since 2017 or earlier and continued to employ the defendant to provide full-time "around the clock" home health care for Jane Doe's disabled sister (the "Sister"). Jane Doe further stated that the defendant managed the Sister's health care providers and that the defendant was authorized to write checks to herself as payment for services rendered and to others if required for the care of the Sister. I reviewed the records of Chase Bank associated with the checking account of Jane Doe and determined that in 2016, a total of approximately $25,264 in checks were paid to "Agneta Aizikovitch" or "Cash" and were endorsed by the defendant and the signature of Agneta Aizikovitch. I also determined that some of the checks drawn on Jane Doe's account were deposited into a Chase Bank account ending in 0672 that is held in the Sister's name and over which the defendant, under the Aizikovitch Identity, has power of attorney (the "0672 Account").

17. Based on my review of Chase Bank records associated with an account opened in the name of the Aizikovitch Identity, with an account number ending in 8324 (the "Aizikovitch Chase Account"), I learned the following:

   a. In 2016, the defendant deposited into the Aizikovitch Chase Account three checks, totaling $9,700, from an in-home health care service provider that had

previously employed the defendant. The defendant also deposited into the Aizikovitch Chase Account the checks described above (totaling $25,264) that were drawn on the account of Jane Doe and made out to or endorsed by the defendant.

    b. In January 2017, the defendant deposited into the Aizikovitch Chase Account three checks, totaling $7,200, from an in-home health care service provider that had previously employed the defendant. In that same month, the defendant also deposited into the Aizikovitch Chase Account checks, totaling $15,739 that were endorsed by the defendant, issued by different in-home health care service providers and made out to different individuals who have been identified as home health aides.

    c. The Aizikovitch Chase Account was closed on or about March 2017.

18. Based on my review of records received from Reliable Check Casher associated with the Welber Identity, I have learned the following.

    a. In 2018, the defendant cashed checks, totaling $71,631, that were drawn on the account of Jane Doe and made out to different individuals who have been identified as home health aides. In that same year, the defendant also cashed checks, totaling $26,384, that were issued by an in-home health care service provider and made out to different individuals who have been identified as home health aides.

    b. In or about and between January 2019 and May 2019, the defendant cashed checks, totaling $29,315, that were endorsed by the defendant, drawn on the account of Jane Doe and made out to different individuals who have been

identified as home health aides. During that same period, the defendant also cashed checks, totaling $20,042.65, that were issued by an in-home health care service provider and made out to different individuals who have been identified as home health aides.

19.   Based on the statements made by Jane Doe, I believe that the checks that were deposited or cashed by the defendant in or about and between 2017 and 2019 were payments to the defendant for caring for Sister and for enlisting other home health aides to care for Sister.

20.   Based on the foregoing information, I determined that while the defendant was receiving SSDI benefits under the Welber Identity, she concealed the fact that she was working and receiving income under the Aizikovitch Identity in or about and between 2006 and 2020. The income earned by the defendant under the Aizikovitch Identity qualified as Substantial Gainful Activity. Had the defendant disclosed her true income to the SSA, the defendant's application for SSDI would not have been approved and she would not have been entitled to the $206,368.50 worth of benefits paid to her since in or about January 2008.

## MEDICARE BENEFITS RECEIVED BY THE DEFENDANT

21.   Medicare was a federal health care program that provided benefits to persons who were at least age 65 or disabled. Medicare was administered by the Centers for Medicare & Medicaid Services ("CMS") a federal agency under HHS. If an individual qualified for SSDI from the SSA, he or she became qualified to receive Medicare benefits after a specified waiting period, which was typically between two and two-and-a-half years from the date of entitlement to SSDI.

Case 1:21-mj-00866-SJB   Document 1   Filed 07/28/21   Page 11 of 18 PageID #: 11

11

22.  From in or about and between October 2008 and May 2021, the defendant received a total of approximately $183,302.04 in Medicare benefits on the basis of her fraudulent application for and receipt of SSDI, as described above.  Had the defendant not received SSDI, she would not have been entitled to any portion of the Medicare benefits that she received during that period.

### MEDICAID BENEFITS RECEIVED BY THE DEFENDANT

23.  Medicaid was a federal health care program that provided benefits to individuals and families who met financial and other eligibility requirements.  Medicaid was also administered by the CMS.

24.  In New York, the Medicaid program was funded by both the federal government and the State of New York.  The federal government provided approximately 50 percent of the funding necessary to pay Medicaid claims, and the State of New York provided the balance.  In order to receive federal funding, New York's Medicaid program was administered in compliance with the rules established by CMS.  The New York State Department of Health ("NY DOH") administered the Medicaid program in New York.  Local departments of social services within New York State processed applications for Medicaid and monitored the provision of plans at the local level.  To qualify as a Medicaid beneficiary in New York, an individual was required to file an application and provide identification information, such as his/her name, address, social security number, household composition and household income.  The income and assets of an individual was an important factor in the determination of whether the individual was entitled to Medicaid.

25.  New York State offered individuals the ability to sign up for health insurance not only with a local department of social services, but also through what was known

as the Facilitated Enrollment Program ("FEP"). Under the FEP, the NY DOH entered into contracts with companies or organizations offering health insurance plans, such as a managed care plan, which were also funded through the Medicaid program, but are administered and branded privately by the company or organization offering the plan. In order to qualify for such plans, an individual was required to meet certain requirements, including income requirements, just as if he or she had applied directly through a local department of social services.

26. In New York City, the pertinent department of social services is the New York City Human Resources Administration ("HRA"). HRA processed applications for health insurance plans falling within the Medicaid program and acted on behalf of the NY DOH. Once an individual was approved by the HRA, the individual was required to renew his/her eligibility annually by submitting a written certification.

27. On or about July 15, 2010, the defendant submitted to the HRA a Medicaid application that was signed and dated by the defendant on July 14, 2010, using the Welber Identity. In her application, the defendant stated that her only source of income was SSDI benefits. Her application was approved on or about August 5, 2010.

28. A review of the records of the HRA show from in or about and between March 2011 and November 2020, the defendant signed and submitted at least nine Medicaid applications certifying that her only source of income was SSDI. At no time during that period did the defendant report any income that she earned under the Aizikovitch Identity. The applications that the defendant completed included warnings that stated, in sum and substance, that federal law provides for penalties if an applicant is untruthful or conceals or fails to disclose facts regarding the applicant's continuing eligibility for assistance. These warnings further

stated, in sum and substance, that the regulations required that an applicant immediately notify the relevant agency of any changes in needs, income, resources, living arrangements or address.

29. The records maintained by NY DOH show that from in or about and between March 2011 and May 2021, the defendant caused Medicaid to pay approximately $1,920,190.13 in benefits under the Welber Identity, in the form of medical services and treatment. Had the defendant disclosed her true income in her initial and subsequent applications, the defendant's application for Medicaid would not have been approved and she would not have been entitled to any of services that Medicaid paid for since March 2011.

SNAP BENEFITS RECEIVED BY THE DEFENDANT

30. The Supplemental Nutrition Assistance Program ("SNAP") is a federal aid program funded by the United States Department of Agriculture, Food and Nutrition Service. SNAP provides food-purchasing assistance for eligible members of certain low-income households ("SNAP recipients").

31. In New York City, eligibility for SNAP benefits is determined, and the distribution of those benefits made, by the HRA.

32. In order to receive SNAP benefits, an individual must submit an application disclosing, among other information, their household members and income. Persons who are deemed eligible to receive SNAP benefits are required by HRA to submit annually a recertification to continue to receive SNAP benefits ("SNAP Recertification"). Like the original application, SNAP Recertification requires the applicant to submit information and certify, among other things, his/her annual income, assets, household composition, and income of household members. Whether a person is entitled to SNAP benefits, and, if entitled, the amount

14

to which that person is entitled, is based in part on the reported household income and composition.

33. From my review of certain documents maintained by the HRA and my discussions with other law enforcement agents and employees of the HRA, I have learned the following information, in substance and in part.

34. On or about February 23, 2010, the defendant submitted an application that was signed and dated by the defendant on February 3, 2010, for SNAP benefits under the Welber Identity. In her application, she certified that her only source of income was SSDI benefits. Based on the information provided in her application, the defendant was approved for SNAP benefits and began receiving SNAP benefits on or about February 25, 2010.

35. In or about and between February 2010 and October 2020, the defendant submitted at least two SNAP Recertifications (in 2011 and 2013) in which she made declarations of her household composition and income. In each SNAP Recertification, the defendant stated that her sole source of income was SSDI benefits. At no time during that period did the defendant report any of that income earned under the Aizikovitch Identity.

36. The defendant received SNAP benefits via an Electronic Benefits Transfer ("EBT") card that was provided to her by the HRA. Thereafter, SNAP benefits were credited onto her EBT card. From between in or about February 2010 and May 2021, the defendant received a total of approximately $25,219.15 in SNAP benefits.

37. I have discussed with representatives of HRA the defendant's eligibility for SNAP benefits based on her actual income, and from those conversations I have learned, among other things, that at no time between February 2010 and May 2021 would the defendant

have been eligible for the SNAP benefits that she received had she accurately reported her household income.

## CONCLUSION

38. I request that the Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the affidavit and arrest warrant. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and arrest warrants via the internet. Therefore, premature disclosure of the contents of this affidavit and related documents could jeopardize the investigation by giving the defendant an opportunity to flee from prosecution or destroy evidence.

WHEREFORE, your deponent respectfully requests that the defendant AGNETA WELBER, also known as "Agneta Aizikovitch," be dealt with according to law.

*Janell Borrison*
Janell Borrison
Special Agent, Social Security Administration,
Office of Inspector General

Sworn to before me by telephone this
_28th_ day of July, 2021

_____
THE HONORABLE SANKET J. BULSARA
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
for the

Eastern District of New York

| | |
|---|---|
| United States of America<br>v.<br><br>AGNETA WELBER,<br>also known as "Agneta Aizikovitch,",<br><br>*Defendant* | )<br>)<br>)  Case No. 21-MJ-866<br>)<br>)<br>) |

## ARREST WARRANT

To: Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*  AGNETA WELBER, also known as "Agneta Aizikovitch," ,
who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment   ❏ Superseding Indictment   ❏ Information   ❏ Superseding Information   ☑ Complaint
❏ Probation Violation Petition   ❏ Supervised Release Violation Petition   ❏ Violation Notice   ❏ Order of the Court

This offense is briefly described as follows:

18 U.S.C § 1542 - False statement in application for passport;
42 U.S.C § 408(a)(4) - Social Security fraud;
18 U.S.C § 1347 - Health care fraud; and
7 U.S.C § 2024(b) - Supplement Nutrition Assistance Program fraud

Date: 07/28/2021

*Issuing officer's signature*

City and state:  Brooklyn, New York

Sanket J. Bulsara, U.S.M.J.
*Printed name and title*

**Return**

This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____
at *(city and state)* _____.

Date: _____

*Arresting officer's signature*

*Printed name and title*

AO 442  (Rev. 11/11)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender:

Known aliases:

Last known residence:

Prior addresses to which defendant/offender may still have ties:

Last known employment:

Last known telephone numbers:

Place of birth:

Date of birth:

Social Security number:

Height:                                              Weight:

Sex:                                                 Race:

Hair:                                                Eyes:

Scars, tattoos, other distinguishing marks:

History of violence, weapons, drug use:

Known family, friends, and other associates *(name, relation, address, phone number)*:

FBI number:

Complete description of auto:

Investigative agency and address:

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*:

Date of last contact with pretrial services or probation officer *(if applicable)*:

**TO: Clerk's Office**
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**APPLICATION FOR LEAVE**
**TO FILE DOCUMENT UNDER SEAL**

*********************************

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION
FOR ARREST WARRANT

21-MJ-866
Docket Number

*********************************

SUBMITTED BY: Plaintiff ___ Defendant ___ DOJ ✓
Name: Virginia T. Nguyen
Firm Name: U.S. Attorney's Office for the EDNY
Address: 271A Cadman Plaza East
Brooklyn, NY 11201
Phone Number: 718-254-6280
E-Mail Address: Virginia.Nguyen@usdoj.gov

INDICATE UPON THE PUBLIC DOCKET SHEET: YES ___ NO ✓
If yes, state description of document to be entered on docket sheet:

**MANDATORY CERTIFICATION OF SERVICE:**
A.) ___ A copy of this application either has been or will be promptly served upon all parties to this action, B.) ___ Service is excused by 31 U.S.C. 3730(b), or by the following other statute or regulation: ___ ; or C.) ✓ This is a criminal document submitted, and flight public safety, or security are significant concerns. (Check one)

July 28, 2021
DATE

_____
SIGNATURE

**A) If pursuant to a prior Court Order:**
Docket Number of Case in Which Entered: _____
Judge/Magistrate Judge: _____
Date Entered: _____

**B) If a new application,** the statute, regulation, or other legal basis that authorizes filing under seal

ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE, AND MAY NOT BE UNSEALED UNLESS ORDERED BY THE COURT.

DATED:  Brooklyn   , NEW YORK
July 28, 2021

_____
U.S. DISTRICT JUDGE/U.S. MAGISTRATE JUDGE

RECEIVED IN CLERK'S OFFICE July 28, 2021
DATE